Mr. Gannon. Good morning. May it please the court. The 382 patent has the same specification that was at issue in the CQG case and at issue in IBG 1 and it's the same, it's the same, the claims of the 382 patent are most closely like the claims in CQG and IBG 1 and IBG 1. So how did that work in the PTAB as far as the timing was concerned? Did they have the prior decisions or any of them before them when they got to this case? They did have the CQG decision when they got to this case. On page 39 of the blue brief, you say the 556 claims are not directed to any business practice or implementing a business practice on a computer, but the spec continuously describes part of the invention as known. For example, it says at column 5 lines 13 and 14 that it uses conversion techniques known in the art. How is this not implementing a known business practice? The specification makes clear that this improved tool, this tool that you interact with, the tool for the trader, can be run on any conventional computer. The data can be mapped to the screen in any conventional way, but what the invention is about is solving problems with prior graphical user interfaces. It doesn't improve the way a GUI operates, does it? It actually does, your honor. In prior trading systems, I'll give you an example. It improves what it displays, correct? Actually, your honor, the invention actually improves the trading interface. How does the code change? Actually, how the code is actually implemented to can be done in different ways. What's important is that, for example, a problem... How does the GUI code change? Pardon me? How does the graphical user interface operating code change? So, for example, your honor, in the prior art figure 2 style screen, there was a problem with accuracy, the way that graphical user interface was constructed, and it caused the users when they went to click on the figure 2 style screen to miss their price because the inside market was fixed on a screen, the prices would be flipping, and so when the trader went to trade, the trader would miss her intended price. So that's a problem with how the interface was constructed. Now, of course, a coder can code that tool in many different ways, but that's not what the invention is about. The invention is about solving a problem with these prior art interfaces. Now, in CQG, the claims required a static price axis. IGB says, at page 41 of its red brief, that in your view, the structure are just the icons in a chart, the makeup is just how these things are arranged, and the function is merely what happens when these alleged structures are manipulated by a user. Why isn't that a valid statement? It's not valid, your honor, because I think what you're referring to, IB was referring to the decisions in this case that found some of TT's patents not to solve problems, not to solve technical problems with technical solutions. For example, in IBG 2 and IBG 3, this court found that those patents, unrelated to this patent, were merely, you know, displaying data, organizing data, not solving problems with the graphical user interface. So that's... We're bound by our correct decision in number 2257, right? You don't dispute that. I agree that IBG 2 and 3 are precedential. However, we believe that IBG 1 is a more better reasoned opinion. Well, that may be, but the trouble is that's non-precedential. So it seems to me you don't have any choice but to agree with us that we're bound by the two precedential opinions, and if you can't get around those, then you can't prevail here. So we can, we do get around those precedential opinions because those patents are distinguishable from the page 12. It distinguishes the earlier opinions as involving claims when it says, quote, when the price changes, solves the purported problem, because it does not specify what happens immediately after the price changes. And it seems to me that that's true here, that the language, for example, that was relied on by the Northern District of Illinois in the CQG case isn't present in the claims here. So, Your Honor, I believe you're referring to the 374 patent, which is another patent with the same specification. And in IBG 2, this court found that those claims did not recite, they didn't display any information on the screen to the trader. No price information. There was basically just black boxes, and, well, and the patent didn't have static price, didn't have a static price axis, which I believe is what you're referring to. No, that's not what I was referring to. What what the opinion 2257 says is even if there's the static price axis, that the patent didn't say what happened after the price change. And what I'm suggesting to you is that the same thing is true here, that it doesn't say anything about what happens after the price changes. Here's the difference, Your Honor. The 374 did not require a static price axis. Well, that's open to question. The language didn't use the word static, but it did say mapping the plurality of sequential price levels does not change. That's right, and what the court said was the 374 patent does not recite static, and so we don't know what happens with the mapping after the price change. Well, I don't think that's an accurate description of the opinion. It says that the claims here don't tell you what happens after the price changes. That's true, that's, that was the finding with respect to the 374 patent. This patent, the 382 patent, like CQG, claims a static price axis. That's not sufficient. It doesn't, the question is whether it tells you what happens after the price changes. It doesn't include the language of Claim 1 of the 132 patent that the district court relied on in the CQG case in which we approved it. The 382 patent, well, let me, let me just, let me go back to, let's go back to the court dealing with the 132 and 304 patent. E-Speed said the claimed invention features static price levels. These unmoving figures have numerous advantages over the prior art. First, a trader can visually follow the market movement, movement. Second, and perhaps most important, the trader has confidence in making an offer at the intended price. That's because of the static price axis. That's the exact, your problem is that when we addressed and harmonized our authority in the 2257 precedential decision, that's not what we said. What we said was that it doesn't tell you what happens after the price changes. That's right. That language, that 132 that resulted in the non-precedential decisions on which you're relying, does not exist in the claims here. But what does exist in the claims? That's correct, isn't it? What, what does exist? Is that correct? Your Honor, I, I, I believe, I'm trying to answer your question. The claim does, the claim does require static, which means that the, the price levels. No, but you're not answering my question. The language that we found significant in 2257 that was present in Claim 1 of the 132 patent does not exist here, right? The mapping language, where in the 374 it says the claims are mapped and that mapping doesn't change when the inside market changes, that exact language isn't in the 382, but it doesn't matter because the 382 patent requires a static price action. Okay, but that's the question as to whether the absence of that language does matter. And it would seem as though in the 2257 decision we said it does matter. It doesn't, it, it, what happened in the, in the 374 decision was this court said, hey, the 374 patent doesn't require static. There's nothing displayed on the screen. So how can it be solving the problem and it doesn't require static? Because we don't know what happens after the price changes. No, that's not what it said. It recognized that the static language is different and that this additional language that talks about what happens after the price changes is what differentiates the two cases. Well, the court did point out that the, that the 374 did not require static. And the, first of all, that's how the court distinguished the 374 from the CQG and IBG-1 cases. But then as you note, Judge Dyke, the court did say, well, there is this mapping limitation, but we don't know what happens after. I agree with that. That's what the court said with respect to the 374 patent. I believe the court looking at this 382 patent, which requires a static price axis and order entry regions along the static price axis where you send orders and you actually set prices when you send the order along a static price axis. That advantage that's discussed in eSPEED, that's discussed in CQG, that's discussed in IB-1, the same advantage is provided by the 382 patent because of the static price axis. And I am, I'm looking at the claims of the 382. Again, the 382 claims, I agree they don't require the mapping, they don't require this language of that the prices are mapped at a time when the inside market changes. But this, this claim is different. The static price axis overrides that. So on this theory of the case, if we agree in terms of the threshold eligibility, then there's still a question, there would be a remand required on the merits, is that right? With respect to the 101 issue, Your Honor, if TT prevails on the 101 issue, we believe no remand would be required because the PTAP found that IB failed to show that this patent was obvious in view of the prior art. And we believe that there's no basis. But that's disputed, is it not? It's disputed, but we believe there's no basis to overturn the PTAP's ruling that these claims are not obvious in view of the prior art. Which is an interesting point with respect to obviousness in that, with respect to the 101 issue in step two, whether the invention's routine, conventional, well understood. Well, that issue is not presented on this appeal, is it? It is an issue. The 101 issue is an issue. But on the obviousness issue. On the obviousness issue, but IB couldn't even establish that the invention was obvious, let alone well understood routine. Well, one of the curiosities is the use of obviousness arguments to justify the 101 aspect. But we'll see. Let's hear from the other side. Okay, thank you, Your Honor. Mr. Picard. Good morning. Byron Picard on behalf of the FLEs. May it please the Court, I respectfully submit that this Court's recent precedential decisions in what the parties are calling IBG 2 and IBG 3 make this a relatively straightforward case for affirmance on the CBM eligibility and the section 101 issues. And so why should we rely on precedent going one way rather than precedent going the other way? Is there a simple distinction in your mind, other than the fact that there were different judges making the decisions as to why there was this split? I think there are two questions there, Your Honor. And if there is an unresolvable tension, this Court needs to follow its precedential decisions. Setting that aside, I do think the Court doesn't have to wade into those waters. If we look at CQG, for example, it's distinguishable from the facts and the patents here. For example, Appendix 38, the Board found that Claim 1 of the 382 patent was broader than the 132 patent, which was involved in the CQG decision and this Court's first non-precedential decision in the IBG case. Non-precedential doesn't mean that we thought that it was incorrectly decided. It's the other way around. We thought it was correctly decided. We just didn't write a detailed opinion of our reasoning. Understood. I want to show you why there are some important distinctions with this case that can allow the CQG case that you've been contradicting it. One distinction is that they're reciting a method of canceling an order entered for a commodity in an electronic exchange as opposed to the display of the GUI. Yes, I think that's a good point. The trading technology theory of the case is this price flipping that in the prior art, when you went to place orders to buy and sell securities, you might miss your price because the moment you were attempting to click, the price would change. The problem of cancellation orders missing your price was not present in the price flipping theory to deal with the cancellation of orders. In fact, claim one, the method claim of the 382 patent, doesn't have any placement of buy or sell orders in it whatsoever. The idea that you're going to miss a price just has no place in the context of claim one. Secondly, if we look at claim one and compare it to dependent claim eight, the price flipping theory doesn't make any sense because claim one in that method, there are no displays of prices. It doesn't make any sense that a user not seeing prices could somehow solve this supposed price flipping problem of the prior art. There's some important factual differences between this case and CQG. In CQG, the court essentially adopted the findings of the district court. The district court there credited the expert testimony of trading technologies, Mr. Thomas. Mr. Thomas stepped through the price flipping theory. We don't have any such credited testimony in this case of Mr. Thomas. The board didn't make that finding. In fact, it went and made a different finding for which it had substantial evidence. Its finding was that taking the market information and displaying it along an axis was a fundamental economic concept. That was supported by record evidence, including the Weiss reference, which is in the briefing. So we can distinguish CQG on the patents and on the record below. I can appreciate the distinction in the result of the fine points of looking at the claims. I have trouble with 101 and why there should be a distinction under 101. Okay, so if we go back to CQG, as I read that case, the court there credited the district court's findings. The district court found that the particular claims of the 132 and that price axis, there was some factual findings to make that determination, because if you look at the specification of any of the patents in this case, the price flipping theory is not supported by the specification. So here, the board credited our conflicting evidence on that point, that this was a longstanding economic practice again, for example, with Weiss. And I think the board was on solid footing when it didn't credit the Thomas expert declaration that the price flipping theory had any application to the 382 patent. Again, because, for instance, claim one doesn't display any prices, the idea that the trader could... But that goes to the merits, the substantive merits of patentability, not the threshold theory of whether you can file an application at all. Well, I think here it does, given the way that Trading Technologies has argued its case. It says that it does not, its claims do not focus on an abstract idea because they improve the functioning of the computer. And that argument reduces to its price flipping theory. So we do have to deal with the merits of that if we're to contend with the issue as Trading Technologies has framed it. The board was on solid footing not to credit that. As I said, the prices aren't displayed. If we look, for example, claim one recites the static price axis, but some of the dependent claims talk about resetting the axis. Trading Technologies hasn't explained how to reconcile those things, given its static price, which, as I understand their theory, is essential to the missing price or price flipping theory. Moreover, they have not addressed the problem of the fact that the method claim one of the 382 patent does not recite trading. I have a housekeeping question for you. Yes. In footnote six, or footnote two on page six, you say, you know, look, during the hearing, T.T.'s counsel was unable to identify the amount of market information that is required to be displayed in claim one. And you recite into appendix 637 to 643, 58.3 to 64.18. I couldn't find that in there, and I asked my clerk to, and she couldn't. So where in that bill is it? Yeah, I'll confess I don't have that information handy. I'd be happy to submit it, have my colleague look for it and stand up later in the hearing, or submit a letter to the court pinpointing that, if that would be helpful. Would you like elaboration by? Well, if they can find it during the rest of the oral argument, you can, counsel, you I may have it for you. Go ahead. I've been pointed to appendix 641. Okay. And I believe the relevant section begins at line 18 of 641 and continues on to 642. If I may, I'd like to quickly touch on CBM eligibility. The major theme emerging from the bill is that CBMs and the computer do not enjoy the technological invention exception of section 18 of the AIA, and that's true here of the 382 patent. Trading technologies advances really only two arguments about why its invention is technological, the first being that it takes traders' working orders and puts them on the static price axis. As the board found, that was nothing more than displaying information, and that was not a It's not disputed that prior art GUIs had that information in the same GUI as the trading information along an axis. It can't be a technological problem to simply display that information in a new fashion. They have the price flipping theory. I've touched on that, why that simply has no application in the 382 patent, and I don't want to belabor some of the quotes that we've put in our supplemental briefing, but I think if you look at the way they describe their own invention, it's quite clear that what this invention is about is about improving the trader and not the computer. For example, Mr. Thomas at JA8963 said that knowing the prices will not change at the moment the trader enters an order engenders confidence and reduces trader hesitation. He continued, this allowed the trader to intuitively sense market movements, thereby enhancing the user's ability to identify and quickly act upon opportunities. That's all about improving the trader. So this patent does not enjoy the technological exception. The board did not abuse its discretion. It was not arbitrary and capricious in its finding. If we turn to the Section 101 issues, like the claims in IBG 2 and 3, these are all about receiving generic market information, displaying that on an axis, and allowing the user to interact with that GUI using conventional input techniques like mouse commands. The board found that that was a fundamental economic practice. We see that with Weiss. If we look at the holdings of IBG 2 and 3, it's of the same flavor. In IBG 2, we talked about claims that restrict new arrangements of generic information that assist traders in processing information. That's the focus of an abstract idea. That's exactly what the claims are about here. It's like the claims in IBG 3, where instead of having price information, it was profit and loss information that was displayed. This board said that simply displaying new or useful information doesn't take an invention out of the realm of abstract ideas. This patent is really just like that. We had the working orders. That information was available, and all they've done is put it in a new and maybe highly relevant place, if you will. It's just like the 768 patent of that case. And finally... How many more of these trading technology cases are working their way through the system? I believe this is the last one. There may be some trailer re-hearing petitions from trading technologies, but aside from that, I understand this to be the last case. What holds you to that? And finally, the board was supported by substantial evidence when it found there was no inventive concept. As the patent states, the inventions are implemented on conventional hardware. It talks about the fact that the programming was insignificant, and that this court ought to affirm on the 101 issues as well. Unless there's any additional questions, I'll allow the government to address the constitutional issues. Okay. Thank you. We'll hear from the intervener, Ms. Patterson. Why has the government intervened in this case? Solely to address the two categories of constitutional claims that trading technology raised in its opening brief. For the reasons we said... Which it didn't argue this morning. And what? Which it didn't argue this morning. And which it didn't argue this morning. We do think the court should hold these forfeited for the reasons set out in our brief, so I'm happy to stand on our briefs if the court has no questions about forfeiture or about the merits of the constitutional questions. So have you intervened to justify the different decisions in the different cases? What is the interest of the United States in the complexities that these various cases have brought to the courts with different results? What's the position of the United States? That they should be different? That they should be the same? On the merits of the patentability questions... The result. The result. Whether we're talking about, when you say merits, are we in Section 101 or some other section of the statute? On the merits, the disposition of these cases, the United States takes no position. There was a challenge under Federal Rule of Appellate Procedure 44 to the constitutionality... Can you speak up a little? Pardon? I said speak up a little. Oh, there was a challenge under Rule 44 to the constitutionality of the America Invents Act on several grounds. So the United States used its authority under 28 U.S.C. 2403 to intervene solely on the basis to defend the constitutionality of the statute. That is our only interest in this case, and those are the only matters we've briefed. So the government's position is that this patentee could not come into court. Is that right? Under 101? I'm not sure I understand Your Honor's question. We think the patentee can certainly... That's the issue before us, right? It's dismissed under 101. Yes, and we think the court... We have no quarrel with the court reviewing the board's 101 analysis. Again, there's been an attack on the constitutionality of the AIA, and that is the issue on which we've intervened. We are not taking a position or in any way suggesting the court can't address the 101 issue pending before it. Okay, you're not taking a position. Correct, Your Honor. The government doesn't care that there are all sorts of different results in different tribunals? Your Honor, I think the government does have a more general interest in 101, but it has not intervened in this case under Section 143 to address the merits or to defend the merits of the board's decision. Obviously... You're saying the constitution authorizes that the unpredictability of these results is inherent in the statute and should be supported? Well, again, Your Honor, we're taking no position on 101. This court, if it feels that there are inconsistent results, of course this court can reverse decisions of the board. We are here solely to defend on the retroactivity and the appointments clause challenges that the appellant raised here. But the decision of the board conforms with some precedent. You're saying it doesn't matter? Your Honor, I want to push back on the idea that we don't care. There are thousands of decisions issued by the board. The director has the ability but is not required to intervene in any appeal from a board decision. And we simply have not used that authority here. So I'm not simply not authorized to take a position on 101 or any of the merits questions beyond the constitutional matters in this case. If the court has no questions about either forfeiture or those constitutional matters, we're happy to rest on our briefs in this case. Well, of course the question is raised. The real question is, I'm still not sure of the government's position. However, we're out of time. Thank you. Thank you, Your Honor. Mr. Gannon, you have three minutes to remain. Thank you, Your Honor. I'd like to pick up on a question Judge Wallach asked about this cancellation. In the prior art, when you had an order entry tool, your working orders were in a different window. And what that meant was, if a trader had to access that working order, they had to navigate to a different window. Of course, if you had two screens, you could have them both open at the same time. You could have them open at the same time if you could fit them on your screen, I suppose, Your Honor. But still, you have to navigate to this working order book. You have to scroll to find your order. And in the prior art, it took multiple actions to cancel. This invention has a specific structure where you have the working order, the entered order indicator, along the static price axis, and paired with single-click functionality. And here's why that's important, Your Honor. When you have your order entry tool, and you're watching the market ebb and flow up and down, this invention puts your working order right next to that price level, and you can quickly get out of the market. I understand what you're saying, but it does seem to me that that's a different problem than the earlier patents addressed, which had to do with orders and a possible mistake in clicking on the wrong price. Absolutely, I agree 100%. This patent is solving an additional problem from the accuracy problem that I was talking about earlier. This claim has all of that. It has static price axis, it's got order entry regions along the static price axis. When you click to enter an order, your working order pops up on the same screen. And if you see the market moving around and you need to get out of your position, you can single-click and get out. That was huge. I invite you to look at the declarations in the record of traders that said this was an amazing improvement over the prior art. Just the single-action cancel alone. Lastly, I'm running out of time here, but with respect to the 101 issue, if I may, here's the root problem with what the other side is saying. They're saying our claims are directed to the use of a GUI and a method of placing an order based on displayed market information, as well as updating the market information. So they're saying that our claims are just displaying market information, updating it, and sending orders. That's not what our claims are directed to. If you look at the level of specificity in this claim, static price axis, order entry region, working order along the static price axis that gives you these advantages, there is no way you can conclude that this is a fundamental economic practice on a generic computer. This functionality didn't exist. It's no different than core wireless. It's no different than data engine, precedentialist decisions from this application case. The court quoted, it talked about the core wireless case and said the invention in core wireless spared the users from the time-consuming operations of navigating to, opening up, and then navigating within each separate application. That's exactly what we have here. The system is improved because now everything's in one interface. It's an improvement over the prior art, and under this court's precedent, that clearly meets 101. Okay. Thank you. Thank you all. The case is taken into submission.